UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JARED J. KOCH,

        Plaintiff,

v.                                    Case No.  8:05-cv-2038-T-TBM

MICHAEL J. ASTRUE,[1]
Commissioner of the United States
Social Security Administration,

        Defendant.
_____/

**O R D E R**

The Plaintiff seeks judicial review of the denial of his claim for Supplemental

Security Income payments.  For the reasons set out herein, the decision is reversed and

remanded.


I.

Plaintiff was twenty years of age at the time of his administrative hearing in June

2005.  While in school, Plaintiff was in special education classes due to an emotional

handicap and a learning disability.  He later attended a school for children with severe

emotional disturbances.  Plaintiff quit school but later earned his GED.  He has worked as a

busboy and grocery store stock clerk.  Plaintiff applied for Supplemental Security Income

---

[1]Michael J. Astrue became Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should
be substituted for Commissioner Jo Anne B. Barnhart as Defendant in this suit.

("SSI") payments in June 2003, alleging disability as of April 29, 1998, by reason of a severe emotional disturbance, an emotional handicap, and a specific learning disability, all of which result in difficulty concentrating, frustration, and an inability to get along with others.[2]  The Plaintiff's application was denied originally and on reconsideration.

The Plaintiff, at his request, then received a *de novo* hearing before an Administrative Law Judge ("ALJ").  The Plaintiff was represented at the hearing by counsel and testified in his own behalf.  Plaintiff's mother, Janice Koch, also testified on Plaintiff's behalf.  Additionally, a vocational expert was called by the ALJ.

In essence, Plaintiff testified that he is unable to maintain steady, full-time employment due to difficulty remembering things, concentrating, sleeping, and with anger. At the time of the hearing, Plaintiff was working part-time as a helper in the meat department of Winn Dixie.  He had only been employed there for about two weeks.  His mother helped him get the job.  He has no contact with the public and works mostly with the manager. Plaintiff testified that he has had four jobs in the last four months.  He was fired from his last three jobs as a busboy because he failed to show up or showed up late.  By his testimony, he has difficulty remaining focused and remembering what time and/or day to come into work.

---

[2]Plaintiff initially sought SSI in February 1999.  His claim was denied originally but benefits were awarded on reconsideration on the basis of oppositional defiant disorder and a learning disability.  Plaintiff's benefits were terminated upon incarceration.  See (R. 126, 225) and (Doc. 16 at 2).  Although not altogether clear, it appears Plaintiff was incarcerated from June 2002 to July 2003.  Thereafter, he served four plus months in jail from October 2003 to March 2004 after being charged with driving under the influence and violating the terms of his release.

However, when he is at work he does not have difficulty doing a job once he is shown what to do.

Plaintiff testified that he began having problems in the third for fourth grade.  He began using alcohol and/or drugs when he was fourteen or fifteen years old.  Plaintiff attended a special school for students with behavior problems.  He indicated he got to the ninth grade before he was incarcerated.  By his account, he and his friends got drunk and robbed another adolescent who had marijuana.  He earned his GED while in prison after attending special classes.  When he was released from prison, he received some mental health treatment.  The medication he was prescribed made him sleepy.

Plaintiff lives with his mother and her boyfriend.  His daily activities consist of working, going to the gym, sleeping, and watching television.  He goes to the gym every other day or whenever his mother or grandmother can take him.  Plaintiff indicated he lifts weights and walks on the treadmill; it helps him relieve stress.  By Plaintiff's testimony, he does not have friends or a social life.  He stopped drinking and smoking marijuana about six or seven months ago when he stopped going to bars and hanging out with friends.  He smokes a pack of cigarettes every two or three days.  Plaintiff does not currently have a driver's license.  He does not do chores around the house.  He indicated that he cannot sleep at night; he stays up all night watching television and sleeps during the day.  Plaintiff occasionally stays with his father.  They get along if his father is not drinking.  Plaintiff testified that he currently was seeing a counselor once or twice a month.  He has been prescribed Trileptal, Lexapro, and Seroquel.  He stated the medication has helped with his bouts of anger, ability to

concentrate, and difficulty sleeping.  Plaintiff testified that he does not have any physical

problems that limit his ability to work.  <u>See</u> Plaintiff's testimony (R. 29-55).

Plaintiff's mother testified that Plaintiff's problems started when he was in third

grade.  He was in special education classes due to a learning disability and emotional

handicap.  He also had a sleeping disorder.  Thereafter, Plaintiff was sent to a special school

for individuals with severe emotional problems.  Plaintiff went to "about the ninth grade."

Thereafter, Plaintiff was in prison for about a year.  After he got out of prison, he moved back

home with her.  He had trouble finding a job.  She sought help for him because she was

worried about how much he was sleeping and he was having nightmares.  Plaintiff

participated in mental health treatment for several months when they could afford it.  Ms.

Koch stated that she does not have insurance that covers Plaintiff and has not had any during

the period in question even though she works two jobs.  When she is at work, Plaintiff mostly

stays home and watches television.  When he goes out, it is to work, the mall, the gym, or to

his one friend's house.  Plaintiff also sees his father some but he has a problem with alcohol.

Plaintiff does not help around the house or pay rent.  She picks up his clothes and she does

not like for Plaintiff to cook because he burns things.  She takes Plaintiff to apply for jobs,

and when he has one, either she or her mother takes him to and from work.  By her account,

Plaintiff has been unable to keep a job for more than a week or two.  She has to stay on top of

him because he has trouble keeping up with a work schedule.  The witness testified that

Plaintiff does not focus well, is depressed, does not have much energy, and lacks motivation.

Ms. Koch also testified that she "lives on eggshells" because of Plaintiff's anger.  However,

she testified further that Plaintiff is on two new medications and they are helping somewhat.

She does not believe that Plaintiff is drinking or doing drugs.  <u>See</u> Ms. Koch's testimony (R. 55-71).

Joyce Courtright, a vocational expert ("VE") testified on an assumption of an individual of Plaintiff's age, education, and vocational experience who could perform work without exertional limitations but was restricted to low stress work (defined as limited to one and two step instructions, unskilled entry level work that is routine and repetitive in nature and that deals primarily with things and not people) that did not involve working with the public or coordinating with coworkers and allowed for a variance in pace and minimal or no changes in setting and procedure.  Upon that assumption, the VE opined that the individual could perform some assembly jobs such as nut and bolt assembly, wrapping and packing jobs such as poly packing and heat seal, and verifying and recording system merchandise marking. Upon the additional assumption that the individual would be absent or fail to show up three times a month, would be off task for one third of the workday, or would be prone to exhibit emotional extremes that would distract himself or others and make himself off task for one hour a day outside of work breaks, the VE testified that no work would be available.  Upon questioning from Plaintiff's attorney, the VE indicated that no work would be available if the medical source statement of Margaret Kelly was credited.  <u>See</u> VE's testimony (R. 72-76).

Also before the ALJ were limited medical records addressing Plaintiff's mental health and school records reflecting his exceptional education.  These matters are addressed adequately by the parties' memoranda and are set forth herein as necessary.

By his decision of July 14, 2005, the ALJ found that while Plaintiff has severe impairments related to depression, a personality disorder, and oppositional defiant disorder,

he nonetheless had the residual functional capacity to perform the full range of heavy

exertional work with the following nonexertional limitations – low stress, unskilled work

consisting of one to two step instructions which involves working primarily with things rather

than people; minimum contact with coworkers and supervisors and no contact with the

general public; an allowance for variances in pace; and work involving minimal or no

changes in procedure.  Upon this finding and the testimony of the VE, the ALJ determined

that Plaintiff could perform jobs available to him in the local and national economy.  Upon

this determination, the Plaintiff was determined to be not disabled.  (R 11-18).  The Appeals

Council denied Plaintiff's request for review, and the ALJ's decision became the final

decision of the Commissioner.


## II.

In order to be entitled to Supplemental Security Income payments, a claimant must

be unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which . . . has lasted or can be expected to last

for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A).  A

"physical or mental impairment," under the terms of the Act, is one that "results from

anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld

if it is supported by substantial evidence and comports with applicable legal standards.  See

id. at § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Miles v. Chater, 84 F.3d

1397, 1400 (11th Cir. 1996). The Commissioner must apply the correct law and demonstrate

that he has done so. While the court reviews the Commissioner's decision with deference to

the factual findings, no such deference is given to the legal conclusions. Keeton v. Dep't of

Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994) (citing Cornelius v. Sullivan,

936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve

conflicts in the evidence and to assess the credibility of the witnesses. Grant v. Richardson,

445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw

inferences from the evidence, and those inferences are not to be overturned if they are

supported by substantial evidence. Celebrezze v. O'Brient, 323 F.2d 989 (5th Cir. 1963).

Therefore, in determining whether the Commissioner's decision is supported by substantial

evidence, the court is not to re-weigh the evidence, but is limited to determining whether the

record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that

the claimant is not disabled. Miles, 84 F.3d at 1400; Bloodsworth v. Heckler, 703 F.2d 1233

(11th Cir. 1983).

The scope of review is limited to determining whether the findings of the

Commissioner are supported by substantial evidence and whether the correct legal standards

were applied. McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Boyd v. Heckler,

704 F.2d 1207, 1209 (11th Cir. 1983).

III.

The Plaintiff raises two claims on this appeal.  As stated by the Plaintiff, they are as follows:

(1) The ALJ failed to evaluate the medical evidence including the opinion evidence presented by acceptable medical sources and other sources in accordance with the Commissioner's regulations and rulings respecting the assessment of such evidence, but instead relied upon the opinions of state agency examiners who did not consider the entire record of the claimant's mental disorders and relied upon supposition, surmise, and conjecture to support their conclusions; and

(2) The ALJ failed to appoint a medical examiner to resolve conflicts in the opinions of the state agency physicians and the claimant's treating clinicians or to obtain further consultative examinations to resolve conflicts and uncertainties expressed by Dr. Hodan in his mental status examination requested by the state agency.

By his first claim, Plaintiff argues the ALJ improperly evaluated the opinions of a consulting psychologist, a treating registered nurse/licensed mental health counselor, and a treating nurse practitioner.  According to Plaintiff, his school records  and employment history substantiate the serious and/or marked level of psychological dysfunction and difficulty with interpersonal relationships that are noted by the opinions of the nurse practitioner and counselor.  By this argument, the clinicians' opinions went beyond that of being simply disability statements reserved to the ALJ and touched on functional limitations that merited significant consideration and weight.  Further, he urges that the ALJ's reason for

8

discounting the consulting psychologist's opinion is unsupported.[3]  Plaintiff also argues that

the ALJ improperly relied on the opinion of a non-examining state agency doctor whose

opinion is contrary to virtually every mental health professional that examined or treated

Plaintiff and who ignored Plaintiff's school records and improperly focused on Plaintiff's use

of alcohol and drugs and incarceration.  (Doc. 16 at 7-14).

 The Commissioner counters that the ALJ properly evaluated and weighed the record

evidence.  As for the opinions of the nurse practitioner and counselor, the Commissioner

contends that the ALJ evaluated their opinions in accordance with SSR 06-03p by providing

additional reasons for rejecting their opinions aside from the fact that they were not

acceptable medical sources and commented on the issue of disability.  As for the ALJ's

adoption of the opinion of a non-examining doctor, the Commissioner asserts that the ALJ's

reliance on that opinion was in accordance with 20 C.F.R. § 416.927(f)(2)(ii) and SSR 96-6p.

Lastly, the Commissioner suggests that the ALJ properly weighed the opinion of the

consulting psychologist because the ALJ's reason for discounting it was supported by the

opinions of the non-examining doctors.  (Doc. 17 at 4-11).

 Dr. Gerald Hodan, a consulting psychologist, evaluated Plaintiff upon request of the

Office of Disability Determinations on July 31, 2003.  He completed a mental status

evaluation as well as an intellectual and abbreviated neuropsychological screening.[4]  Plaintiff

scored in the borderline range on the intelligence testing and scored poorly in all aspects of

---

[3]In support of this argument, Plaintiff cites to Social Security Ruling ("SSR") 06-03p
and the regulations at 20 C.F.R. §§ 416.913 and 416.927.

[4]Dr. Hodan also reviewed the results of past psychological and intelligence testing.

9

the memory testing except for the area of working memory.  These results were significantly lower than previous ones.  Dr. Hodan opined that Plaintiff's depressed mood could be partially responsible for the lower scores, and he indicated that the results were not a true reflection of Plaintiff's abilities.  Nonetheless, it was the psychologist's opinion that Plaintiff lacked insight and judgment.  His diagnostic impressions included bipolar disorder, most recent episode depressed, without psychotic features; post-traumatic stress disorder; alcohol and cannabis abuse, in sustained full remission; bereavement; antisocial personality disorder; and a current GAF of 45.[5]  Dr. Hodan did not identify specific mental work capabilities other than to conclude that Plaintiff was "obviously an individual with a poor prognosis as regards being able to find and maintain employment right now."  The psychologist also concluded that Plaintiff's condition was not likely to change over the next twelve months without a significant level of intervention.  (R. 231-37).

State agency doctors reviewed Plaintiff's records and completed mental residual functional assessment forms in September and December 2003.  Dr. James Mendelson, a clinical psychologist, opined that Plaintiff had moderate limitations in his ability to (1) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (2) complete a normal workday and workweek without interruptions

---

[5]GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning."  AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV).  A GAF of 41-50 indicates either "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  Id.

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) accept instructions and respond appropriately to criticism from supervisors; and (4) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.[6]  (R. 238-39).  Dr. David Grippe, a psychiatrist, reported the same limitations.[7]  (R. 258-59).  The psychiatrist indicated that Plaintiff was nonetheless able to follow simple instructions such that he could perform simple, routine, repetitive tasks.  (R. 260).

Carole Sharman, a registered nurse and licensed mental health counselor, counseled Plaintiff and his mother on two occasions in 2005.  By her description, Plaintiff has bipolar disorder, uncontrolled; severe learning disabilities; and attention deficit disorder.  She indicated that Plaintiff has poor judgment, periods of decompensation and rage, and a GAF of 45.  She indicated further that Plaintiff was unable to care for himself, wash clothes, or use

---

[6]Dr. Mendelson challenged the prior diagnosis of bipolar affective disorder and found the evidence of depression or anxiety equivocal.  By his "close examination," the evidence suggested some degree of secondary gain, symptom exaggeration, and impression management. (R. 240).  In his view, despite the discernible impairments in functioning, Plaintiff has the "skills requisite for personal care, independent living, and reasonable social/avocational pursuits." (R. 241).  Aside from Dr. Hodan's evaluation and records from Suncoast Center for Mental Health (dated 1998/1999), it is unclear what other record evidence Dr. Mendelson reviewed.

[7]Dr. Grippe's notes reflect his opinion that while Plaintiff might experience some difficulties in social interactions and display some occasional distractibility, he was capable of performing simple, routine, repetitive tasks.  (R. 260).  He noted further that Plaintiff would perform best in an environment where social demands are kept at a minimum and he indicated that Plaintiff was in need of behavioral therapy and cognitive behavioral intervention.  Id.  This reviewing doctor also challenged earlier diagnoses and believed the better diagnosis was for alcohol and cannabis abuse and antisocial personality disorder.  His notes reflect that he reviewed all records that were then available.  See (R. 274).

public transportation.  In her opinion, Plaintiff is incapable of attending school, working, or

maintaining his hygiene and activities of daily living without his mother's help.  In short, she

opined that Plaintiff was unable to sustain employment because his moods were labile, he

could not complete tasks or remember instructions for repetitive tasks, and he was profoundly

depressed.  (R. 282-83).

      Margaret M. Kelly, an advanced registered nurse practitioner, treated and/or

counseled Plaintiff on at least four occasions between January and May 2005.  Her diagnostic

impressions included bipolar disorder, attention deficit disorder, and conduct disorder.  She

assessed a GAF of 39[8] and prescribed Trileptal, Lexapro, and Seroquel.  (R. 289-92).  In June

2005, she completed a form entitled "Medical Source Statement Concerning the Nature and

Severity of Individual's Mental Impairment."  Out of twenty categories dealing with

understanding and memory, sustained concentration and persistence, and social interaction

and adaption, she opined that Plaintiff was markedly limited in eighteen areas and moderately

limited in two areas.  (R. 285-87).  She opined further that Plaintiff was unable to understand,

remember, and carry out simple instructions; make judgments that were commensurate with

the functions of unskilled work; respond appropriately to supervision, co-workers and usual

work situations; and deal with changes in a routine work setting.  (R. 287-88).  It was her

---

      [8]A GAF of 31-40 indicates "some impairment in reality testing or communication
(e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several
areas, such as work or school; family relationships; judgement; thinking; or mood (e.g.,
depressed man avoids friends, neglects family, and is unable to work; child frequently beats
up younger children, is defiant at home, and is failing at school)."  DSM at 32.

opinion that these limitations had lasted twelve continuous months and were chronic and life-long.[9]  (R. 288).

The ALJ addressed each of the above opinions.  With regards to Dr. Hodan, the ALJ noted only that:

> [a] psychological evaluation of the claimant on July 31,
> 2003, revealed intelligence quotient (IQ) scores consistent
> with mild mental retardation despite earlier testing
> demonstrating the claimant to be of average intelligence.
> The evaluator . . . speculated that the claimant's test
> performance was adversely affected by the claimant's
> depressed mood.  This theory is perhaps one possible
> explanation for the claimant's poor performance.  Another,
> and possibly more likely, reason for the claimant's poor
> performance is that the claimant was attempting to
> exaggerate his mental impairments for the purpose of
> secondary gain.

(R. 15).  As for Ms. Sharman and Ms. Kelly, the ALJ discounted their opinions on grounds that they commented on an issue reserved to the Commissioner (i.e., that Plaintiff was disabled) and were not "acceptable medical sources" under the regulations.  Id.  The ALJ further discounted Ms. Sharman's conclusions, including but not limited to the conclusions that Plaintiff was mentally slow, has periods of decompensation, and was unable to care for himself, finding that such were unsupported by other substantial evidence of record.  Id.  He also found that Ms. Kelly's assessment was unsupported by other substantial evidence of record, including but not limited to Plaintiff's own testimony.  Id.  After rejecting these

---

[9]Ms. Kelly also noted that Plaintiff's work history was punctuated with frequent psychiatric hospitalizations.  (Doc. 288).  One notation indicated that Plaintiff was at the Harbor for four months.  (R. 288, 290).  Those records are not before the court.

opinions, the ALJ adopted the findings of Dr. Grippe in fashioning the Plaintiff's mental functional capacity.  Plaintiff challenges these findings.

Upon careful consideration, I conclude that a remand is warranted.  First, I agree with Plaintiff that the ALJ erroneously relied on Dr. Grippe's opinion when determining Plaintiff's mental residual functional capacity.  As the Eleventh Circuit has cautioned, "[t]he opinions of nonexamining, reviewing physicians, . . . when contrary to those of examining physicians are entitled to little weight in a disability case, and standing alone do no constitute substantial evidence."  Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988) (quoting Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987)).  This error was compounded by the fact that neither Dr. Grippe nor the other non-examining doctor had the benefit of reviewing the entire record.  Notably, they did not review the records of Ms. Sharman or Ms. Kelly.  Next, the ALJ failed to make clear the weight he was according the opinion of Dr. Hodan.  See Sharfarz, 825 F.2d at 279 (providing that the ALJ must state with particularity the weight given different medical opinions and the reasons therefore).  His failure to do so muddies the water, particularly given that Dr. Hodan appears to be the only examining source who is an "acceptable medical source."[10]  Lastly, I find it appropriate that the opinions of Ms. Sharman

---

[10]Under the regulations, sources who provide information on a claimant are divided into two groups-- "acceptable medical sources" and "other sources."  "Other sources" are divided into "medical sources" and "non-medical sources."  20 C.F.R. § 416.913(a), (d). "Acceptable medical sources" include licensed physicians, and licensed or certified psychologists.  Id. at § 416.913(a).  "Other" medical sources (or non-acceptable medical sources) include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists.  Id. at 416.913(d).  The primary differences between "acceptable medical sources" and "other" medical sources are that only "acceptable medical sources" can provide evidence to establish the existence of a medically determinable impairment, provide medical opinions, and be considered treating sources.  Id.

and Ms. Kelly be revisited in light of the SSA's clarification of its policies governing

consideration of "other" medical sources as set forth in SSR 06-03p.[11]  See NLRB v. Food

Store Employees Union, 417 U.S. 1, 10 n.10 (1974) (stating that "a court reviewing an agency

decision following an intervening change in policy by the agency should remand to permit the

agency to decide in the first instance whether giving the change retrospective effect will best

effectuate the policies underlying the agency's governing act").

By his second claim, Plaintiff argues the ALJ should have either ordered a

consultative evaluation or obtained medical expert testimony to address the clear conflict in

the medical evidence, namely, the difference in the opinions between the non-examining,

state agency doctors and Dr. Hodan, Ms. Sharman, and Ms. Kelly.  Plaintiff cites to the Social

Security Administration, Office of Hearings and Appeals, Litigation Law Manual

("HALLEX") I-2-5-34 to show that medical expert testimony was warranted and to Reeves v.

Heckler, 734 F.2d 519 (11th Cir. 1984) and 20 C.F.R. § 404.1519(b)(4) to demonstrate that a

consultative evaluation was necessary.  (Doc. 16 at 14-18).

The Commissioner responds that Plaintiff fails to demonstrate that the ALJ needed to

appoint a medical expert or order a consultative evaluation in order to develop a full and fair

---

at §§ 416.913(a), 416.927(a)(2), 416.927(d).

[11]SSR 06-3p clarifies the policies of Social Security Administration ("SSA") on how
to evaluate and weigh relevant opinions and other evidence from "other sources," including
medical opinions from sources who are not "acceptable medical sources."  SSR 06-03p, 2006
WL 2329939 (S.S.A.).  According to the SSA, the driving force behind the ruling is the
growth of managed health care and utilization of professionals such as nurse practitioners,
physician assistants, and licensed clinical social workers.  Id. at *3.  Here, it appears that
these sources were the best Plaintiff could obtain in his financial circumstances.

record.  By the Commissioner's reading of the record, there was sufficient evidence for the ALJ to determine Plaintiff's claim.  Additionally, the Commissioner points out that Plaintiff did not establish that he was prejudiced by the alleged omissions.  (Doc. 17 at 11-13).

It is well-settled that the ALJ has a basic duty to develop a full and fair record. Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).  This obligation exists whether or not the claimant is represented by counsel.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  In light of this obligation, an ALJ must order a consultative examination when "such an evaluation is necessary for him to make an informed decision."[12]  Holladay v. Bowen, 848 F.2d 1206, 1209 (11th Cir. 1988) (quoting Reeves, 734 F.2d at 522 n.1).  However, case law in this circuit requires the Plaintiff to show some prejudice before a remand to the Commissioner for further development is ordered.  See Graham, 129 F.3d at 1423.  In considering whether a remand is required, the court should guided by whether there are evidentiary gaps in the record that result in unfairness or clear prejudice.  Id.  The need for medical expert testimony is generally left to the discretion of the ALJ.  HALLEX I-2-5-32, 1994 WL 637369 (S.S.A.) (Sept. 28, 2005).

Upon careful review of the record, I am unable to conclude that the ALJ erred by failing to obtain testimony from a medical expert.  While one may have proven useful given that the non-examining doctors did not review the complete record, no law, rule, or policy mandates that the ALJ obtain such testimony under the circumstances that exist here (i.e., a

---

[12]Under the Commissioner's regulations, a consultative evaluation is also normally required when "[a] conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved . . ."  See 20 C.F.R. § 416.919a(b)(4).

16

conflict in the evidence).  Notably, the section of the HALLEX on which Plaintiff relies

utilizes permissive language – may– not must.  See HALLEX I-2-5-34, 1994 WL 637370

(S.S.A.) (Sept. 28, 2005) (ALJ *may* need to obtain a medical expert's opinion when the

medical evidence is conflicting and the ALJ believes a medical expert may be able to help

resolve the conflict).  The situations under which an ALJ *must* obtain medical expert

testimony are not present in this case.  See id. at I-2-5-34(B) (medical expert opinion required

when Appeals Council or court so orders, to evaluate and interpret background medical test

data, and when the ALJ is considering finding that the claimant's impairment(s) medically

equals a medical listing).

As for the matter of a consultative evaluation, despite the fact that neither Plaintiff

nor his attorney requested the ALJ to obtain any type of additional evaluation, I conclude that

one was necessary for resolution of the conflicting opinions and an informed decision in this

case.  Here, the opinions of the non-examining state agency doctors (on which the ALJ

erroneously relied) conflicted with the opinions of Dr. Hodan, which are fairly read to

conclude that Plaintiff is without the mental functional capacity to engage in full-time gainful

activity.  This conflict was left unresolved given that the ALJ did not state the weight

accorded Dr. Hodan's opinions.  While not acknowledged by the ALJ, it is worth noting that

Dr. Hodan's opinions are supported by the opinions of Ms. Sharman and Ms. Kelly.  Notably,

neither Dr. Grippe nor Dr. Mendelson reviewed the records of those clinicians.  Furthermore,

the assertions by Drs. Grippe and Mendelson that Plaintiff's claims lack clinical support are

not fully borne out by the record.[13]  While there are sparse and limited treatment notes in the record, Plaintiff's school records support a long history of documented behavioral issues and emotional problems.  Plaintiff's mother confirmed the history.  As for the lack of treatment, Plaintiff's mother testified she did not have insurance for Plaintiff during the relevant period and thus she could not always obtain treatment for Plaintiff when needed.  Aside from these considerations, I am troubled by the fact that the ALJ does not appear to take a longitudinal view of Plaintiff's mental difficulties.  As indicated above, school records suggest that Plaintiff's emotional and behavioral problems started at an early age and his work history was sketchy at best.  The ALJ ignored this.  He also failed to mention that Plaintiff previously was awarded SSI payments due to his mental impairment(s) and that benefits were terminated only because Plaintiff was incarcerated, not because there was a demonstrated improvement in his mental condition.  Contrary to the Commissioner's assertion, the portions of the record ignored or improperly discounted by the ALJ support Plaintiff's claim of disability and establish clear prejudice.  In the given circumstances, the ALJ was obliged to obtain an additional mental evaluation of the Plaintiff in order to make an informed decision.


IV.

For the foregoing reasons, the decision of the Commissioner of the United States Social Security Administration is not supported by substantial evidence or is not in accordance with the correct legal standards.  The decision is reversed and remanded for

---

[13]This did not stop the non-examining doctors from offering their own diagnoses in contradiction to prior diagnoses.

18

further proceedings before the Commissioner consistent with this Order.  Accordingly, the

Clerk is directed to enter Judgment in favor of the Plaintiff and to close the case, and the

matter of fees and costs shall be addressed upon further pleadings.

      **Done and Ordered** at Tampa, Florida, this 28th day of September 2007.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of record